[J-91-2020] [MO: Todd, J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT**

| | | |
|---|---|---|
| IN RE: P.G.F | : | No. 7 WAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: K.F., NATURAL FATHER | : | Superior Court entered January 27, |
| | : | 2020 at No. 1284 WDA 2019 |
| | : | affirming the Order of the Court of |
| | : | Common Pleas of Bedford County |
| | : | entered August 7, 2019 at No. 3 AD |
| | : | 2018 |
| | : | |
| | : | ARGUED: October 22, 2020 |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                    **DECIDED: MARCH 25, 2021**

I respectfully dissent. While I am in general agreement with Justice Wecht's dissenting opinion, I write separately to highlight the record evidence of the legal representation afforded to this child ("Child") whose life will be forever impacted by this proceeding terminating the parental rights of his biological father ("Father").[1] Although the Majority blesses the appointed guardian ad litem/legal counsel's ("Counsel") representation of Child's legal interest, the Majority never supports its conclusion with

---

[1] My analysis of the issues is based on the record of the case on remand to the Orphans' Court from the Superior Court where the sole issue was Counsel's determination of whether Child's legal and best interests were aligned or in conflict. *See* N.T., 8/7/2019, at 1-25. The record on remand, detailing Counsel's testimony, with ten pages of interjection by the trial judge, runs for a total of only twenty-five pages including the recitation into the record by the trial judge of Counsel's summary of her twenty-minute interview with the client on June 10, 2019. Child was one month shy of seven years old at the time of Counsel's consultation. *Id.* at 11.

citation to the record. The result of this varnished analysis is to elevate Counsel's unwillingness or inability to communicate information to her client over compliance with her responsibilities under the Rules of Professional Conduct, thus enshrining subpar representation as the norm for children in termination of parental rights proceedings.

It is beyond dispute that in the view of Counsel, her conclusion as to her client's preference as to the outcome of the termination proceedings, i.e., his legal interest, hinged on his preferred living arrangement. On examination by Father's attorney to probe Counsel's conclusion that she did not have a conflict representing both Child's best interests and legal interests, the following information was elicited:

> Mr. Kelleher: … [Counsel], do you think the child was able to express his preferred outcome or do you believe he was incapable of expressing that with him not knowing what permanent adoption even means?

> Counsel: Well, I explained to him what adoption meant, that his daddy, [Stepfather] would become his daddy under the law. It would not change his concern that he wouldn't be able to live with his mommy. I said, well, I didn't want to go too far with him because I didn't want him to think that something would happen between his mommy and daddy and he would lose them. So, I was trying to be very cautious with him, but I said, if something would happen between his mommy and daddy that he would live with one of them. So, he would always, he would always have contact with the other I hoped, anyways. Because he was concerned that he would be taken from his mommy and daddy.

> \* \* \*

| Mr. Kelleher: | Do you believe that Child was able to express his preferred outcome at the time of the interview? |
|---|---|
| Counsel: | Yes. |
| Mr. Kelleher: | … Do you agree that he understood what he was trying to determine? |
| Counsel: | I think Child understood that he wanted to live with his mommy and daddy. And I asked him several, numerous times during the interview. Obviously mommy wasn't an issue, but I asked him numerous time [sic] during the interview who daddy was. And he always said [Stepfather]. |

N.T., 8/7/2019, at 8-9.

As the record further establishes, counsel saw the termination proceeding as creating a binary option for Child's consideration, and one of the two options was one she was unwilling to present to Child.

| Mr. Kelleher: | So preferred outcome only involved -- there wasn't two options would you agree with that? |
|---|---|
| Counsel: | Right, but I think, I think Judge Ling said it extremely well, I don't believe -- I was not able to say to Child that [Father] is his biological father and that's and [sic] option. If you want to live with your biological father who is not [Stepfather], then that's an option. I don't think I have the authority or the right to say that to him because he, Child, did not understand that. Like, Child did not understand that [Stepfather] was not his daddy.[2] … |

[2] Earlier in her testimony, Counsel stated that Child never called Stepfather "Daddy" until June 10, 2019 (the day of her interview with her client). According to Child, he always called Stepfather by a shortened version of his first name before that date. N.T., 8/7/2019, at 12. Child referred to Stepfather's parents as "Mr. and Mrs. [H.]" *Id.* at 5 (After identifying his maternal and paternal grandparents by affectionate names, "I questioned

*Id.* at 16-17.

This record establishes that Child was given a fundamentally flawed view of the outcome of the termination proceeding. If Father's parental rights were not terminated, there was no basis to allow Child to fear that he could no longer live with Mother and her husband, Stepfather, or that Stepfather would have to forego acting in a parental role as he purportedly had been doing. Assuming that in the future the biological father sought custody rights, another court would design the parameters taking into account Child's needs.

Moreover, while counsel was focused on the maintenance of the existing custodial relationship between Child and his mother and stepfather, it is troubling that in articulating his preferred outcome of the termination proceeding, Child's known and articulated preference for a relationship with his "Grammy" (Father's mother) was unprotected when his preference for termination was placed on the record. My colleague, Justice Wecht, in dissent, thoroughly articulates the unsettled state of the law on the effect of termination of a parent's rights on the grandparents whose interests flow from that parent. Wecht Dissenting Op. at 2 n.1. Counsel had a responsibility to consider the state of the law and its effect on Child's preferred outcome of having a relationship with Father's mother. The sum total of her articulated consideration of Child's preference and his sadness about not seeing his Grammy: "[W]hat do I do with that information?" N.T., 8/7/2019, at 17. Acknowledging that she could not tell Mother what to do, she concluded, "so is life fair? No." *Id.* at 18. Given Child's known preference and that a potential outcome of the

him about his daddy's parents and what he called them, his response was 'Mr. and Mrs. [H.]'").

termination was that Father's mother would not be able to have a relationship with him, it is very difficult to support the view that Child's preference was for the termination of Father's parental rights.

Because the record is silent on the actual information about the termination proceeding that counsel gave to Child, we can only assume that the entirety of her explanation was based on the impact the proceedings would have on his living arrangements. This conclusion is based not only on her specific response to the questions regarding the basis for Child's preferred outcome as previously described, but also on her articulated view that conveying information to her client about the actual purpose and outcome of the proceeding was not her responsibility. Counsel testified:

> … And when he [(Child)] told me that he didn't know who [Father] was, do I tell him, well -- I would have to explain to him why [Father] wasn't in his life and I don't think I have any right to say, well, because it would be my opinion from the testimony, I guess. I would have to say, "Mommy kept Daddy away from you." And I'm not going to destroy these kids that I'm guardian of. I don't think that's my job. I really don't .

*Id.*

There are multiple levels of problems with this recitation. First, why Father is not currently in Child's life was not an overarching consideration. If relevant, there are ways to explain the situation other than making Mother (or anyone else) the villain.[3] What was relevant to Child's understanding of the proceeding was that there is another person who

---

[3] Counsel candidly testified that in her view, Mother kept Child away from his biological father and that Mother was being rewarded for her conduct. N.T., 8/7/2019, at 12. She believed that it was in Child's best interest for Father's rights to be terminated because case law required Father to take steps to stop Mother's obstruction and he failed to do so. *Id.*

has an interest in being a part of his life, and the outcome of the proceeding will prevent him from doing so. Second, Counsel's only attempt to describe this other person with an interest in him was to ask Child if he remembered a "[Father's name]"[4] from visits with his Grammy. ("Mr. Kelleher: Did you ask, did you do it without using a name? Was anybody else that ever came over to Grammy's house? Was there any guys there? Any males there? Counsel: No." N.T., 8/7/2019, at 19.) It is entirely possible that Child remembered the nice man who spent time with him at Grammy's house. The limitations of Counsel's ability to communicate with Child left that avenue of inquiry untouched. From this record, it is not possible to determine whether Child had a recollection, fond or otherwise, of his biological father.

The Majority recognizes that in certain cases, an expert in child psychology will be warranted to assist counsel in communicating with a child in a termination proceeding, but concludes that this is not such a case. Given this record, to me, this is precisely a case that warrants the assistance of an expert. Most concerning about the opinion of Counsel was her view that the only way to describe the legal proceeding to Child in order to elicit his preference was to do it in a way ("Mommy kept Daddy away from you") that would "destroy" him. Given her proposed delivery of the information, she was likely correct in her assessment, but it was based on the faulty premise that this malignant approach was the correct and only way to convey the information. As a result, Child was given misinformation about the nature of the proceeding, because he was guided by

---

[4] Mother insisted that as a condition of paternal grandmother's continued contact with Child, she could not allow him to refer to Father as dad. N.T., 8/7/2019, at 19.

Counsel who believed it was not her job to explain it to him and because she was incapable of devising an age appropriate way of conveying accurate information.

The Majority concludes that "under the unique circumstances of this case," counsel adequately discharged her responsibilities as legal counsel. Majority Op. at 17. In summary, the Majority blesses the representation by an attorney representing a child in a termination proceeding who misstated the consequences of the proceeding; who refused to provide accurate information about the nature of the proceeding based on her conclusion that the only way to do so is by blaming the child's mother for the situation; who apparently was unable or unwilling to probe the child's knowledge of biological father in any way other than to reference his given name; who failed to take into account the child's preference for a relationship with Father's mother; and who failed to recognize that the involvement of an expert in child counseling was warranted.[5] With due respect to the learned Majority, in my view, its conclusion is at odds with the Rules of Professional Conduct governing lawyers in Pennsylvania. Regarding communications with clients by an attorney, R.P.C. 1.4(b) provides:

> Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers from diminished capacity. See Rule 1.14. …

---

[5] The record establishes that Child preferred to continue living with his mother and stepfather. That tells us nothing about Child's preference about the outcome of the termination proceeding. If the record supported the view expressed by the Majority that Child was, by way of age and emotional development, unable to comprehend the nature of the proceedings and the factual circumstances surrounding it, *see* Majority Op. at 17, the correct determination is that Child was unable to state a preference. His legal and best interests coincided and counsel had no conflict. *Compare In re Adoption of C.J.A.*, 204 A.3d 497 (Pa. Super. 2019). This was not the conclusion reached by Child's Counsel.

In turn, Rule 1.14(a) provides:

> When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

Comment [1] to Rule 1.14 recognizes that in such cases, maintaining the ordinary attorney-client relationship may not be possible in all respects. A client with diminished capacity, a term that is used interchangeably with minority, often has the ability to understand, deliberate upon and reach conclusions about matters affecting the client's own wellbeing. To illustrate, the comment specifically references that children "as young as five or six and certainly those of ten or twelve" have opinions entitled to weight in custody proceedings.

Finally, Comment [6] to Rule 1.14 gives guidance to lawyers in determining the extent of the client's diminished capacity (a term that encompasses minority):

> … the lawyer should consider and balance such factors as: the client's ability to articulate reasoning leading to a decision, variability of state of mind and ability to appreciate consequences of a decision; the substantive fairness of a decision; and the consistency of a decision with the known long-term commitments and values of the client. In appropriate circumstances, the lawyer may seek guidance from an appropriate diagnostician.

The rules make clear that an attorney representing a child has the responsibility to communicate information that is necessary to effectuate the representation. Here, Counsel to Child had the obligation to give him the information necessary for him to express his preference in the outcome of the proceeding that was brought to terminate his biological father's parental rights. The rules recognize that children are not the equivalent of competent adults in their ability to comprehend and process information.

Likewise, all children are not alike. Depending on age and mental development, some may be more able to process information than others. In termination of parental rights cases, it is incumbent on legal counsel to determine the extent of her client's ability to comprehend and process information. Rule 1.14 provides guidance on the types of factors that need to be considered and balanced when counsel makes a determination as to the child's ability to make a decision — here, stating a preference as to the outcome of the termination of parental rights proceeding. These factors are not, of course, exclusive of other considerations that might give insight into a child's ability to understand and accept information.

Here, Child's ability to comprehend and process the information required to state a preference was never assessed. The determination that he could state a preference was made by Counsel after she decided that she was not going to communicate relevant information to him because he did not remember a man with Father's name and she had no intention of otherwise explaining how the proceeding would affect him because of his mother's role in his biological father's absence from his life. Conveying this information, in the most brutal possible way, was not in Child's best interests according to his legal counsel. N.T., 8/7/2019, at 12-13. Ignoring for the moment that the choice of messaging is the problem, this conflates the dual roles of her appointment. In fact, Counsel's determination of Child's best interest was the basis for her decision to withhold relevant information from him. *Compare* N.T., 8/7/2019, at 12, *with* N.T., 8/7/2019, at 8-9.

It is impossible from the record to discern whether Child had the maturity and attendant ability to comprehend truthful information about his biological parentage and the effect of the termination proceeding. Because Counsel's ability to communicate

information to the client was obviously limited, a skilled child counsellor should have been engaged to assist in making the determination as to Child's ability, first to comprehend information and if so able, to state a preference. To me, it is not possible for this child to have articulated a preference when he was not given the basic information he needed to make a decision.

Counsel has an obligation to consider the information that needs to be conveyed and how to convey it. Unless the determination is first made that a child does not have the maturity and emotional capacity to entertain accurate information delivered in an age appropriate manner, an attorney has no authority to withhold information from the client. Rule 1.4, Comment [7] (Withholding Information) recognizes that a lawyer may be justified in **delaying** transmission of information when the client would be "likely to react imprudently to an immediate communication." It does not authorize delaying transmission of information in other circumstances. The rules do not allow withholding information when no cogent attempt was made to convey the information so that any negative consequence could be accurately assessed. Counsel to a child in a termination proceeding can only withhold information if a child is determined to be incapable of understanding the nature and consequences of the proceeding based on the child's age and emotional maturity. Essential to this determination is an attempt to provide accurate information about the proceeding and its consequences. If the determination is made that the child is incapable of comprehending the information, counsel is then free to withhold the information and to determine that the child's legal and best interests coincide.

In this case, Counsel concluded, before attempting to ascertain Child's ability to process accurate, non-inflammatory information about the termination of parental rights

proceeding, that it was not in his best interests to receive the information necessary to articulate his preference in the outcome. The record does not support a conclusion that Child had the advice of counsel necessary to articulate a preference as to the outcome of this proceeding. Moreover, given Counsel's knowledge of Child's preference for a relationship with his paternal grandmother and the unsettled state of the law regarding the impact of termination of Father's rights on grandmother's legal relationship with Child, I conclude that Counsel's articulation of Child's preference for termination of Father's rights is contradicted by the record. I would remand to the Orphans' Court to reconsider the termination of Father's parental rights in light of Child's preference to maintain the paternal familial relationship. But for this record evidence of Child's preference, I would remand to the Orphans' Court for appointment of separate legal counsel to engage an appropriate expert in child psychology or counseling if new counsel finds it necessary to aid in determining Child's ability to state a preference and otherwise assist in adequately communicating the information necessary to do so.

Justice Wecht joins this dissenting opinion.